## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  16-cv-01883-WJM-GPG

**JEROD LANCE WADE,**

   **Plaintiff,**

v.

**ART SMITH,** in his official and individual capacity as Detentions Captain;
**STEVE FARLOW**, in his official and individual capacity as Former Detentions Captain and Lieutenant;
**BRIAN WADE PACHECO,** in his official and individual capacity as Lieutenant;
**RUSS KENDALL,** in his official and individual capacity as Lieutenant;
**BRENDA APOLINAR,** in her official and individual capacity as Lieutenant;
**SHAWNA ROUNDTREE,** in her official and individual capacity as Sergeant;
**CHRISTOPHER KIEFER,** in his official and individual capacity as Sergeant;

   **Defendants.**

---

### Defendants' Motion for Summary Judgment

---

Defendants Smith, Farlow, Pacheco, Kendall, Apolinar, Roundtree and Kiefer

(collectively, "Defendants") file their Motion for Summary Judgment pursuant to Fed. R. Civ. P.

56.  The Court should grant the Motion because:

1.   The law of the Tenth Circuit provides that classification is not a right protected by the 8th or 14th Amendments and is not entitled to due process protections and therefore, Plaintiff's claim that his rights were violated by his classification and the lack of due process prior to changing his classification cannot stand as a matter of law;

2.   Plaintiff was not re-classified or moved in retaliation for filing kites[1] or grievances because Plaintiff filed more grievances than any other inmate during his time in the jail but was never placed on kite restriction or otherwise had his

---

[1] "Kites" are the term used in the Mesa County Detention Facility ("MCDF") for the documents inmates and pre-trial detainees file to make ordinary, daily requests.  Facts at 3.

ability to file kites restricted in any way.  Instead, Plaintiff was placed in Cedar pod for inmate and jail safety and management reasons while an inmate at MCDF;

3.      Objective data demonstrates that white prisoners were no more likely to be classified as Plaintiff was and placed in Cedar Pod than any other race and, therefore, there is no genuine question of fact or law that Plaintiff was not discriminated against based upon his race in being placed in Cedar pod; and

4.      If the Court were to find, against the weight of authority, that Plaintiff's had a liberty or other protected interest in his classification or was entitled to due process prior to changing his classification, this would represent a change in law that would require Defendants to be granted qualified immunity from Plaintiff's claims and require dismissal of this matter.

5.      Plaintiff is no longer incarcerated in MCDF and therefore lacks standing to challenge its policies and procedures.  Further, Plaintiff has not demonstrated the requisite constitutional significance to challenge his prison records.

### Introduction

Mr. Wade alleges that he was classified as a dangerous inmate (and/or gang member) and placed into solitary confinement by the Mesa County Detention Facility ("MCDF") without due process and that his classification was done in retaliation for filing "kites" and/or as a result of racial discrimination (he alleges he was discriminated against because he was white/Caucasian). Movant's Statement of Undisputed Facts ("Facts") at 1;  Second Amended Complaint ("Complaint") at 16-20.  Classification at MCDF is the on-going process through which pre-trial detainees and inmates[2] are evaluated with respect to the security or safety risk the person poses to him or herself, other inmates and staff and for other general jail management issues.  Facts at 2.  In MCDF, inmates are placed in housing units or "pods" based on inmate history, various safety/security risks and medical/special issues.  Facts at 4.  The pods range from

---

[2] During his incarceration at MCDF, Mr. Wade was a pre-trial detainee with respect to charges in Mesa County but he had already been convicted of other crimes in Arizona.  Ultimately, for purposes of this motion, Mr. Wade's status as either a pre-trial detainee or as an inmate has little relevance because, as detailed below, neither a detainee nor an inmate has a protected liberty or due process interest in classification.

maximum/restricted (the highest level) housed in "Cedar 3" pod, to maximum/general housed in "Cedar 2" pod, to medium security in "Spruce" pod, to minimum security and risk in "Oak" and other pods.[3]  Facts at 5.  During his incarceration at MCDF, Mr. Wade was originally housed in various pods and then moved to Cedar. Facts at 7.   Mr. Wade's move to Cedar, which is at issue in this litigation, was based on his re-classification as a person posing a security risk to other inmates in Pinyon pod and otherwise disrupting the management of the jail.  Facts at 8.  This decision was made after many months of observation by MCDF staff, several disciplinary issues and, most importantly, multiple inmates requesting "self-regression," a concept where an inmate can ask to be moved to a different or higher level, in this case in order to get away from Mr. Wade.  Facts at 9.   Notably, after Mr. Wade's re-classification to Cedar, these problems ceased thereby confirming to MCDF staff that the re-classification had been both necessary and successful. Facts at 10.

Per policy, Mr. Wade was moved to Cedar 3 for approximately 2 weeks while he was observed.  Facts at 11.  He was then moved to Cedar 2 for the remainder of his stay, although he was thereafter offered a chance to go back to a medium pod, but he refused.  Facts at 12.  Although inmates in Cedar 3 are restricted in their out of cell time, the restrictions and conditions in Cedar 2 are the same or substantially similar to those of the general population pods like Oak and Pinyon, with the exception that Cedar inmates are watched more closely by MCDF staff. Facts at 13.

---

[3] There are additional pods in MCDF, for example, Aspen Pod is for female inmates, the different sections of Willow Pod have different classifications (medium and minimum) , and Pinyon is used as an intake area and for inmates in need of protective custody pod but has been used for medium classification inmates.  Facts at 6.  The relevant pod for this matter is Cedar pod and Plaintiff's classification as a safety/security risk and for jail management issues.  Facts at 8.

Mr. Wade has brought four claims relating to his classification in Cedar:  1)  a first amendment violation for using classification as retaliation for filing kites; 2)  a procedural due process claim for failing to provide a hearing or other process prior to changing classification; 3) an equal protection violation alleging that only white persons were placed in Cedar pod; and 4) a claim for injunctive relief asking MCDF to alter official records of his classification and the reasons therefore.  *See* Complaint at 16-19.

However, as detailed below, the Tenth Circuit has consistently held that inmates do not have a protected right to classification, or any corresponding right to due process with respect to classification.  Further, it is undisputed that Mr. Wade was never placed on "kite restriction" or otherwise barred or restricted from filing kites and he in fact continued to file kites, grievances and grievance appeals following his classification in Cedar pod.  Thus, there is no basis in law or fact to conclude that Mr. Wade's classification had a chilling effect on his speech (in the form of kites) to sustain a claim for retaliation.  Further, as Mr. Wade is no longer incarcerated at MCDF, he has no standing to request injunctive relief relating to MCDF records.  Finally, there is no genuine issue of material fact to support his claim that he was discriminated against because he is white.  Accordingly, Defendants move for summary judgment on all of Mr. Wade's claims in this case.

## Movant's Statement of Material Facts

1.     Mr. Wade alleges that he was classified as a dangerous inmate and placed into solitary confinement by the MCDF without due process and that his classification was done in retaliation for filing "kites" and/or as a result of racial discrimination (he alleges he was

discriminated against because he was white/Caucasian). Second Amended Complaint ("Complaint") at 16-20.

2.      Classification at MCDF is the on-going process through which pre-trial detainees and inmates are evaluated with respect to the security or safety risk the person poses to him or herself, other inmates and staff and for other general jail management issues.  Ex. 1, Affidavit of Art Smith ("Smith Affidavit") at ¶ 6, attached hereto and incorporated herein for reference as if fully set forth herein.

3.      "Kites" are the term used in the MCDF for the documents inmates and pre-trial detainees file to make ordinary, daily requests. Smith Affidavit at ¶ 4.

4.      In MCDF, inmates are placed in housing units or "pods" based on inmate history, various safety/security risks and medical/special issues.  Smith Affidavit at ¶ 7.

5.      The pods range from maximum/restricted (the highest level) housed in "Cedar 3" pod, to maximum/general housed in "Cedar 2" pod, to medium security in "Spruce" pod, to minimum security and risk in "Oak" and other pods.  Smith Affidavit at ¶ 8.

6.      There are additional pods in MCDF, for example, Aspen Pod is for female inmates, the different sections of Willow Pod have different classifications (medium and minimum) , and Pinyon is used as an intake area and for inmates in need of protective custody but has been used for medium classification inmates.  Smith Affidavit at ¶ 9.

7.      During his incarceration at MCDF, Mr. Wade was originally housed in various pods and then moved to Cedar.  Smith Affidavit at ¶ 10.

8.      Mr. Wade's move to Cedar 3 was based on his re-classification as a person posing a security risk to other inmates in Pinyon pod and otherwise disrupting the management of the jail.  Smith Affidavit at ¶ 11.

9.      This decision was made after many months of observation by MCDF staff, several disciplinary issues and, most importantly, multiple inmates requesting "self-regression," a concept where an inmate can ask to be moved to a different or higher level, in this case to get away from Mr. Wade. Smith Affidavit at ¶ 12.

10.     After Mr. Wade's re-classification to Cedar, these problems [disciplinary issues and self-regression referenced in Facts at 8] ceased thereby confirming to MCDF staff that the re-classification had been both necessary and successful.  Smith Affidavit at ¶ 13.

11.     Per policy, Mr. Wade was moved to Cedar 3 for approximately 2 weeks while he was observed. Smith Affidavit at ¶ 14.

12.     Mr. Wade was then moved to Cedar 2 for the remainder of his stay (except for a brief move to Cedar 1 while repairs occurred in Cedar 2), although he was thereafter offered a chance to go back to a medium pod, but he refused.  Smith Affidavit at ¶ 14-15.

13.     Although inmates in Cedar are restricted in their out of cell time, the restrictions and conditions in Cedar are the same or substantially similar to those of the general population pods like Oak and Pinyon, with the exception that Cedar inmates are watched more closely by MCDF staff and inmates in Cedar 3 are restricted in out of cell time.  Smith Affidavit at ¶ 16.

14.     During Wade's most restrictive incarceration in Cedar 3 for approximately two weeks, he had a private cell with private restroom facilities, and he had access to food, water, and medical treatment like other inmates. Smith Affidavit at ¶ 17.

15.      The only distinction between Cedar 3 and the rest of Cedar is that while in Cedar 3, inmates are restricted from in-person association with other inmates (they talk to each other at/through their cell doors) and Cedar 3 inmates are limited in their out-of-cell time, both dayroom time and yard time.  They are also not allowed to order commissary.  In all other respects, incarceration in Cedar 3, is the same or substantially the same as incarceration in any of the other pods. Smith Affidavit at ¶ 17.

16.      While Cedar inmates are restricted in their ability to attend religious and rehabilitative meetings with general population prisoners and they are restricted from interacting with general population prisoners, in all other ways, they are afforded the same access to and use of the facilities, including food service, showers, medical care, etc.  Smith Affidavit at ¶ 17.

17.      Wade only identifies three programs, Jewish study group, behavioral modification group and Alcoholics Anonymous, that he was restricted from participating in while he was located in Cedar 3. Ex. 2, Deposition of Jerod Wade ("Wade Deposition") at 84-85, attached hereto and incorporated herein for reference as if fully set forth herein.

18.      The number of kites sent by an inmate typically has more to do with the inmate than anything else, meaning that some inmates send so many kites (often nonsensical for those with mental health issues) that they are placed on kite restrictions.  Smith Affidavit at ¶ 19-20.

19.      A kite restriction is just as it sounds:  an inmate who abuses the process by filing numerous groundless, frivolous or baseless kites can have their ability to file kites restricted for a period of time in accordance with legitimate penological interests.  Smith Affidavit at ¶ 21.

20.    During his time at the MCDF, Mr. Wade filed significant numbers of kites and filed more than twice the number of grievances and appeals than any other inmate.  Smith Affidavit at ¶ 22.

21.    However, even given the number of kites, grievances and appeals Mr. Wade filed, he was never placed on restriction and his ability to file kites, grievances and appeals, and to have them addressed was never impeded, including during his time in Cedar pod.  Smith Affidavit at ¶ 23.

22.    Inmates in Cedar 2 and Cedar 3 file kites frequently and therefore, the mere fact of being classified into Cedar pod has no demonstrable impact on the filing of kites. Smith Affidavit at ¶ 25.

23.    Mr. Wade testified that he himself was not chilled in his filing of kites because he continued to do so after the changes in his classification occurred. Wade Deposition at 74.

24.    Wade was classified into Cedar 3 because he represented a risk to the safety and security of the inmates, staff and facility.  Smith Affidavit at ¶ 11 and Ex. 3, Deposition of Shawna Roundtree ("Roundtree Deposition") at 79-90, attached hereto and incorporated herein for reference as if fully set forth herein.

25.    Mr. Wade was associated with known shot-callers, he actively intimidated other inmates, and many inmates asked to "self-regress" in order to get away from Mr. Wade and his influence.  Roundtree Deposition at 75-77; 79.

26.    Self-regressing is a request by an inmate to be placed in a higher or different security level so that they are moved from their current housing to a new housing. Smith Affidavit at ¶ 12 and Roundtree Deposition at 56.

27.     Sergeant Roundtree recommended that Mr. Wade be re-classified into Cedar pod because of the problems and concerns he was raising with other inmates in Pinyon pod. Roundtree Deposition at 79.

28.     Based on Sergeant Roundtree's evaluation of Mr. Wade's inmate activity logs, her conversations with other deputies, her conversations and investigation into self-regressing requests from other inmates and her and other MCDF staff's observations of Mr. Wade, she recommended that he be classified to Cedar.  Roundtree Deposition at 51-52; 79.

29.     Captain Smith investigated the race of inmates placed in Cedar 2 for the period from October 14, 2014 when Mr. Wade was first placed into Cedar 2 through August 3, 2017. Smith Affidavit at ¶ 26.

30.     Captain Smith's analysis reveals that, during that time, the racial makeup of the inmate population for the whole of the MCDF was as follows:

> 2015 - African-Americans constituted 3.73% of all bookings into MCDF
> 2016 – African-Americans constituted 3.24% of all bookings into MCDF
> 2017 – African-Americans constituted 4.0% of all bookings into MCDF
> 2015-2017 - Hispanics constituted 16% of all bookings into MCDF
> 2015-2017 - Caucasians constituted 80% of all bookings into MCDF

Smith Affidavit at ¶ at 28.

31.     During that same period (2015-2017), the racial breakdown of inmates in Cedar 2 was as follows:

> African-Americans constituted 9.4% of all inmates housed in Cedar 2
> Hispanics constituted 13.5% of all inmates housed in Cedar 2
> Caucasians constituted 77% of all inmates housed in Cedar 2

Smith Affidavit at ¶ 29.

32.     Although the data was not specifically researched, empirically, Captain Smith believes that data for Cedar 3 is the same or substantially the same as the data reported for Cedar 2.  Smith Affidavit at ¶ 30.

33.     This analysis reflects *post-hoc* research into the race of inmates placed in Cedar pod compiled to refute the specific allegations in this case.  Racial classification is not tracked, reviewed or otherwise utilized in any way by MCDF nor is it part of any policy at MCDF in determining classification of either pre-trial detainees or inmates.  Smith Affidavit at ¶ 27.

34.     The factors MCDF took into consideration in classifying Mr. Wade into maximum security were related to his conduct while an inmate at MCDF and unrelated to his race.  Smith Affidavit at ¶ 31.

35.     Mr. Wade is no longer incarcerated in the MCDF and was released in November 2016.  Complaint at 1.

36.     Mr. Wade testified that he is seeking through his request for injunctive relief to expunge his record of information he believes is incorrect in stating or implying that he is a member of a gang because he believes that someone somewhere might take adverse action against him or harm him.  Wade Deposition at 78-79.

37.     Mr. Wade does not testify that anyone has taken any adverse action against him, only that it might happen in the future. Wade Deposition at 78-79.

38.     Despite all of the kites, grievances and appeals that Mr. Wade filed, he never requested that his record be expunged.  Mr. Wade submitted a single request to have information removed from his behavioral reports and, at his request his name was removed from one incident report and another incident report in which he was named was deleted. This is the only request

Mr. Wade made to have information removed from a record while at MCDF and his request was not refused.  Smith Affidavit at ¶ 24.

### Summary Judgment Standard

Summary judgment under Fed.R.Civ.P. 56 is appropriate when "…the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). While the moving party generally bears the initial burden of showing the absence of a genuine dispute concerning a material fact, "[w]hen, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001).

"Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex* 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(e). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City& Cnty of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The Court must "view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party." *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).  Nevertheless, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327; *citing* Fed. R. Civ. P. 1.

In cases brought pursuant to 42 U.S.C. § 1983, the Supreme Court has limited the evaluation of liberty interest like the ones asserted here, to "conditions involving atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484, 115 S. Ct. 2293, 2300, 132 L. Ed. 2d 418, 430, 1995 U.S. LEXIS 4069, *22, 63 U.S.L.W. 4601, 95 Cal. Daily Op. Service 4627, 95 Daily Journal DAR 7920, 9 Fla. L. Weekly Fed. S 207 (U.S. 1995).  The "[c]ourt must accord wide-ranging deference to prison administrators 'in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Hill v. Wash. State Dep't of Corr.*, 628 F. Supp. 2d 1250, 1263, 2009 U.S. Dist. LEXIS 86511, *13 (W.D. Wash. 2009)(internal citations omitted).  Even though prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations.  *Bell v. Wolfish*, 441 U.S. 520, 545-546, 99 S. Ct. 1861, 1877-1878, 60 L. Ed. 2d 447, 472-473, 1979 U.S. LEXIS 100, *49 (U.S. May 14, 1979)("'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'  The fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights.

There must be a 'mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.'")(internal citations omitted).

**Arguments and Authority**

**1.     Classification is not a federally protected liberty interest entitled to due process protections.**

In the Tenth Circuit, "[g]enerally, a prisoner has no inherent constitutional right to enjoy a particular security classification." *Casanova v. Ulibarri*, 2011 US. Dist. LEXIS 161270, *14 (D. New Mexico 2011) *citing Templeman v. Gunter*, 16 F.3d 367 (10th Cir. Colo. 1994). Further, "a prisoner's classification into segregation does not deprive an inmate of a liberty interest protected by the due process clause, nor is a hearing required." *Id. citing Bailey v. Shillinger*, 882 F.2d 651, 652 (10th Cir. 1987) *and Frazier v. Dubois* 922 F.2d 560 (10th Cir. 1990). "[T]the Constitution does not provide a prison inmate with any liberty interest in his classification or placement because he is not entitled to any particular degree of liberty in prison. Due process guarantees do not protect every change in the conditions of confinement having a substantial adverse impact on the prisoner." *Brooks v. Medina*, 2011 U.S. Dist. LEXIS 120467, at *4-5 (D. Colo. Oct. 17, 2011)(internal citations omitted).

Thus, Tenth Circuit law is clear that Mr. Wade was not entitled to any process prior to a change in his classification. Accordingly, Mr. Wade's claim based on a lack of due process prior to a change in classification must be dismissed as a matter of law.[4]

---

[4] If the Court were to now find some due process right in classification, against the weight of authority, the Defendants would be entitled to qualified immunity for the reasons set forth in Section 2.a below.

Giving Mr. Wade the broadest possible reading of his due process claim, the Court could conclude that Mr. Wade is actually arguing that he was subjected to cruel and unusual punishment by being classified into Cedar pod.  *See* Complaint at 17 ("[Defendants] punished Mr. Wade without giving him any notice or hearing…").  This reading is not consistent with the allegations in the case or the pleadings, but, even assuming, *arguendo*, that such a strained reading can be distilled from the Complaint, Mr. Wade cannot establish that he suffered cruel and unusual punishment from his transfer to Cedar pod.

In order to prove a claim for cruel and unusual punishment from a classification change, Plaintiff must show that the change restricted his freedom in such a way as to "impose atypical and significant hardships on [Mr. Wade] in relation to the ordinary incidents of prison life." *Ulibarri* 2011 U.S. Dist. Lexis 161270 at *15 (internal citations omitted).  In other words, while Mr. Wade had no protected interest in any certain classification, and he had no due process rights to satisfy prior to classification and relocation, did his classification and relocation cause him to suffer cruel and unusual punishment?  It did not.

Mr. Wade was specifically asked in his deposition "other than the fact that you couldn't play cards and that kind of thing, are there any specific activities on this list [Deposition Ex. 1] that you did partake in while in Oak and Pinyon that you couldn't do in Cedar?"  Mr.  Wade could only identify three things, namely, he could not meet with a Jewish study group, he could not participate in a behavior modification group, and he could not participate in Alcoholics Anonymous while in Cedar.  Facts at 17.  Further, even during his most restrictive incarceration in Cedar 3 for approximately two weeks, he had a private cell with private restroom facilities,

and had access to food, water, and medical treatment like other inmates.  Facts at 14.  The only distinction between Cedar 3 and the rest of Cedar is that while in Cedar 3, inmates are restricted from associating with other inmates (although they talk to each other through their cell doors) and Cedar 3 inmates are limited in their out-of-cell time, both dayroom time and yard time.  Facts at 15.  Classification into Cedar 3 happened for Mr. Wade, as detailed below, because he represented a risk to the safety and security of the inmates, staff and facility and thus, there was a legitimate penological interest in keeping him segregated from other prisoners while MCDF observed him to determine if he was fit to be moved out of Cedar 3.  Facts at 24.  Captain Art Smith, in his affidavit, clearly identifies the daily differences between classification in the general population and in Cedar pod and describes in detail that there are no cruel, unusual, atypical or significant hardships placed on inmates in Cedar as opposed to those inmates housed in the lower security pods.  Facts at 15.

As Mr. Wade himself testified, Cedar inmates are restricted in their ability to attend religious and rehabilitative meetings with general population prisoners and they are restricted from interacting with general population prisoners (hence they cannot play cards together).  But, importantly, in all other ways, they are afforded the same access to and use of the facilities, including food service, showers, medical care, etc..  Facts at 16.  While it is fair to say that prisoners in Cedar pod are more closely observed, there is no evidence upon which a reasonable person could conclude that conditions in Cedar pod are so burdensome or harsh as to constitute atypical hardships significantly greater than those faced by general population prisoners.  To this issue, *Foster v. Carver*, 2008 U.S. Dist. Lexis 42059 (D. Utah – Central Div. 2008) is directly on point:

> Plaintiff's assertion that his transfer to the special housing unit, with its attendant loss of privileges and programming options, amounted to cruel and unusual punishment under the Eight Amendment also lacks merit.  It is well settled that prisoners do not have a constitutional right to participate in rehabilitative or other programs. "Courts have not accepted the claim that an inmate has a constitutional right to any educational, or other programs, and there has never been a recognized constitutional right of rehabilitation for prisoners." *Termunde v. Cook*, 684 F. Supp. 255, 259 (D. Utah 1988); *see also Johnson v. Galli*, 596 F. Supp. 135, 139 (D. Nev. 1984) ("There is no constitutional right to rehabilitation; idleness and a lack of programs do not violate the Constitution.")

*Foster v. Carver*, 2008 U.S. Dist. LEXIS 42059, *5-6

The fact that Mr. Wade himself could not articulate any hardships other than lack of ability to participate in religious and rehabilitative programs and play cards establishes this point beyond any reasonable doubt.  Accordingly, Mr. Wade's claims regarding his classification both under a due process analysis and a cruel and unusual punishment analysis must be dismissed.

**2.      Mr. Wade has not identified any constitutionally protected conduct that is susceptible to a retaliation claim and, even if he had, he has failed to demonstrate any actual harm from any alleged retaliation or a causal connection between his classification and any alleged protected conduct.**

In the Tenth Circuit, in order to establish a First Amendment retaliation claim, a prisoner must demonstrate the following elements (the "*Shero* test"): (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.  *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007); *see also Laratta v. Raemisch*, 2014 U.S. Dist. LEXIS 42824, *13-15 (D. Colo. Feb. 26, 2014). With respect to prong 3, "[a] plaintiff must prove that but for the retaliatory motive, the incidents to which he refers, . . . would not have taken place." *Id.*

The Tenth Circuit appears split on the question of whether inmates (and pre-trial detainees) have a constitutionally protected right to a grievance process within a jail, prison or detention facility.  <u>Compare</u> *Von Hallcy v. Clements*, 519 F. App'x 521, 523 (10th Cir. 2013)("[T]here is no independent constitutional right to state administrative grievance procedures." *citing Boyd v. Werholtz*, 443 F. App'x 331, 332 (10th Cir. 2011); *and citing Butler v. Brown*, 58 Fed. Appx. 712 (9th Cir. 2003) ("[A] prisoner has no constitutional right to prison grievance procedures."), *Young v. Gundy*, 30 F. App'x 568, 569-70 (6th Cir. 2002) ("[T]here is no inherent constitutional right to an effective prison grievance procedure.") *and Boyd, 443 F. App'x at 332)*("Nor does the state's voluntary provision of an administrative grievance process create a liberty interest in that process.") <u>with</u> *Morris v. Fallin*, 2017 U.S. Dist. LEXIS 67402 (D. Ok. 2017)("Prison officials may not retaliate against prisoners for exercising their constitutional rights, including filing internal prison grievances.") *and Colon v. Coughlin*, 58 F.3d 865, 872 (2nd Cir. 1995)(holding that prison officials may not retaliate against prisoners for filing lawsuits or petitioning the government for redress of grievances).

It appears, although it is far from certain, that there exists a tension in the Circuit (and between circuits) relating to grievances under due process rights versus free speech or other rights that leaves unanswered the obvious question:  if you have no right to a grievance process at all, can you still have a first amendment right to file a grievance?.  Nevertheless, for purposes of satisfying prong 1 of the *Shero* test and for purposes of qualified immunity as detailed below, it cannot be said with reasonable certainty that, in the Tenth Circuit, at the time of the events in question, Mr. Wade had a constitutionally protected right to file grievances sufficient to sustain a retaliation claim.

It is undisputed that Mr. Wade's retaliation claim is based on his filing grievances internally within the MCDF system[5].  Complaint at 16-17.  Mr. Wade confirms that his retaliation claim is based on what he believed to be retaliation for filing kites within the MCDF system:

> Q.   Do you think the two are connected?  Because your complaint seems to say that you think moving to Cedar was more retaliation maybe from some of the different kites you filed or is it all connected?
>
> A.   Well, I think -- I think it was -- it's connected because the kited programs, I ask them to participate in it, kind of got blown off on it.  Kited programs again to follow up on it.  Kind of got blown off on it. Kited programs again, got denied. Then I kited Apolinar, which is the chain of command, asked for a grievance, and I think the fact that I just wouldn't take no for an answer -- in fact, I know that's the situation, because I know how Mesa County is.
>
> …
>
> Q.   Okay.  To the extent we didn't cover it, I'm just going to take you through your four claims and just ask you a couple of questions.  On the retaliation claim, I think we've established that it's your contention that you were retaliated against because you had successfully filed different kites and grievances and that sort of thing.  Is there any other thing that you can think of that they would have been retaliating against you for other than the fact that you filed those two successful grievances?
>
> A.   I just feel it's -- in a nutshell, it's retaliation because of the strong-willed nature of my character and the fact that I challenge their authority.  And I've even heard it from even staff that worked there and stuff that, you know, if you challenge or cross or go against Pacheco -- I've heard specifically by name -- and, you know, other administration people there, like, they go out of their way and they will target you, they will retaliate, because for so long they're used to just doing what they wanted and not being challenged.  So I think the retaliation, in general, was due to the grievances that I filed.  But the fact that nothing they did or even though their attempts were to chill, you know, my voice and then my right to seek redress and stuff, they weren't being successful…

Ex. 2, Wade Deposition at 35-36; 74.

---

[5] Thus, unlike *Coughlin*, there is no claim based on Mr. Wade's attempt to seek redress of his issues with the Court through, for example, the filing of a lawsuit, a motion or other legal papers.

If the filing of kites is not a constitutionally protected activity, Mr. Wade's claim fails prong 1 of the *Shero* test requiring him to show constitutionally protected conduct and therefore, he has failed to establish a claim for retaliation.  Alternatively, if the Court were to find, that the filing of kites in the MCDF grievance process is a constitutionally protected activity, Mr. Wade's claims fail for three reasons:  1)  such an interpretation is contrary to at least part of the law of the Tenth Circuit and, therefore, the law on this point was not well-settled at the time of the alleged wrongful conduct and Defendants are, therefore, entitled to qualified immunity on the retaliation claim;  2)   Mr. Wade has failed to demonstrate an injury to his protected right that would chill the filing of kites; and 3)  Mr. Wade has failed to demonstrate a "but for" connection between filing kites and his classification.

> a.  *Qualified Immunity Bars Claims where the alleged wrongful conduct was not well-settled as a matter of law at the time of the act or actions.*

The defense of qualified immunity protects government officials[6] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When qualified immunity is asserted as a defense (as it is here), the burden of proof shifts to the Plaintiffs to come forward with sufficient evidence to satisfy a two-prong test:  1) that the defendant violated a constitutional right; and 2) the infringed right was clearly established at the time of the alleged wrongful activity such that the defendant knew or reasonably should have known that the conduct was illegal.  *Wilson v. City of Lafayette*, 510 Fed. Appx. 775, 776-777, 2013 U.S. App. LEXIS 2954, *4 (10th Cir. Colo. 2013); *Ramirez v. Bd. of*

---

[6] Defendants are sued in their individual capacities and official capacities.  *See* Complaint.

*Cnty. Comm'rs*, 2017 U.S. Dist. LEXIS 5576, *17 (D.N.M. Jan. 13, 2017).  The scope of qualified immunity is broad; indeed, the rule of qualified immunity "provides ample support to all but the plainly incompetent or those who knowingly violate the law." *Burns v. Reed*, 500 U.S. 478, 494-95 (1991) (*quoting Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  Even where a constitutional violation has occurred, an officer will be immune from suit if he or she "could have reasonably believed that his particular conduct was lawful." *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).  Thus, in order for Plaintiffs to satisfy their burden, they must demonstrate that "every reasonable official would have understood that what he did violated the law." *Wilson*, 510 Fed. Appx. at 777.

Here, at least part of the law of the Tenth Circuit provides that the filing of internal grievances, "kites, grievances and appeals" in the vernacular of the MCDF, are not a constitutionally protected right.  *See Von Hallcy*, 519 F. App'x at 523.  Thus, if this Court were to now find that the conduct of filing kites is a constitutionally protected right, it would be doing so against the weight of contrary authority in the Circuit.  As a result, the Defendants would each be entitled to qualified immunity from Plaintiff's retaliation claim because their conduct was not clearly established as wrongful conduct under the law at the time they acted and no reasonable official would have clearly understood otherwise.

    *b.  Plaintiff cannot demonstrate that the alleged retaliation would chill a person of ordinary resolve from filing kites nor can he demonstrate that but for his protected conduct, the classification would not have occurred.*

Mr. Wade has also failed to satisfy the second and third elements of a retaliation claim by adequately establishing that a change in classification would chill a person of ordinary resolve

from filing kites or that but/for his filing of kites, his classification changes would not have occurred.

i. <u>Defendants conduct did not have a chilling effect that would deter a person of ordinary resolve from filing kites.</u>

As a threshold matter, in Captain Smith's experience, the number of kites sent by an inmate typically has more to do with the inmate than anything else, meaning that some inmates send so many kites (often nonsensical for those with serious mental health issues) that they are placed on kite restrictions[7].  Facts at 18.  According to Captain Smith, Mr. Wade filed more than twice the number of grievances and appeals than any other inmate in his time at MCDF.  Facts at 20.  Importantly, despite filing more grievances than any other inmate during his time at MCDF, <u>Mr. Wade was never placed on kite restrictions</u>.  Facts at 21.  If MCDF were attempting to take steps to dissuade or chill an inmate, like Mr. Wade, from filing kites, the easier and more effective method is to place him or her on kite restrictions.  Changing classification without a kite restriction has no impact on an inmate's ability to file kites whenever they want and thus, no chilling effect on kite filing.  Accordingly, there is no evidence that changing Mr. Wade's classification had or was intended to have any impact on his filing kites because it was not accompanied by any kite restrictions.  Additionally, inmates in Cedar 2 and Cedar 3 file kites as frequently as inmates in any other pod and therefore, the mere fact of being classified into Cedar pod has no demonstrable impact on the filing of kites.  Facts at 22.

---

[7] A kite restriction is just as it sounds:  an inmate who abuses the process by filing numerous groundless, frivolous or baseless kites can have their ability to file kites restricted for a period of time in accordance with legitimate penological interests.  Facts at 19.

Mr. Wade testified that he himself was not chilled in his filing of kites because he continued to do so after the changes in his classification occurred.  Specifically, Mr. Wade testified as follows:

> Q.  Okay.  After your move to Cedar 3 and then Cedar did you file any more grievances or kites after that?
>
> A.  Yes, I did.
>
> Q.  Related to the classification, or were there others?
>
> A.  There's all kinds of other issues.
>
> Q.  I've seen a lot of them.
>
> A.  Yeah.  Basically, after, like, there was nothing they could -- much more they could do to me.  And so I, at that point, wasn't worried about the retaliation that I probably would have, you know, not filed on certain issues or not pushed and raised as big of an issue about it if I would have been in general population where I had, you know, something that they could retaliate against me about.  But once I was already retaliated against and there was nothing further left, then it was -- it was --I'm not the type of person -- I'm not going to put forth energy into something that -- you know, there's just --just to do it.  You know, everything that I raised and every grievance I've ever filed and stuff like that dealt with something that was provable or had been proven to be a valid concern or interest, so -- but there was –
>
> Q.  Okay.  So on the grievances and kites and appeals and that sort of thing that you did after you get into Cedar 3 and then Cedar 2, which is after the first we already talked about, did you prevail on any of those?
>
> A.  Yes.
>
> Ex. 2, Wade Deposition at 48-49.

Thus, as Mr. Wade himself expressed, classification into Cedar pod cannot demonstrate a chilling effect sufficient to satisfy prong 2 of the *Shero* test because being put into Cedar pod will not likely stop anyone from continuing to file kites as there is no further consequence to continue filing kites and thus, no deterrent effect.  *Id.*

In light of the facts that Mr. Wade was not placed on kite restriction at any time during his stay at the MCDF, and that inmates at MCDF classified into Cedar pod are not chilled from filing kites and because there is no evidence to the contrary other than Mr. Wade's conclusory allegations and assumptions, there can be no genuine issue of material fact or law that mere classification into Cedar pod is not intended to and does not have a chilling effect or any other effect that would prevent an inmate or any person of reasonable resolve from continuing to file kites.  Accordingly, Mr. Wade cannot satisfy the second prong of the *Shero* , namely, that he suffered a chilling injury to a constitutionally protected right.

ii.  MCDF had several legitimate safety and security concerns that justify and explain Mr. Wade's classification and that are wholly unrelated to filing kites.

With respect to the third prong of the *Shero* test, Mr. Wade cannot show that but/for his filing of kites, he would not have been classified into Cedar pod.  "An inmate claiming retaliation must allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998)(internal citation omitted).  That is, "it is imperative that [a] plaintiff's pleading be factual and not conclusory. Mere allegations of constitutional retaliation will not suffice; plaintiffs must rather allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights.*" Frazier v. Dubois*, 922 F.2d 560, 562 n.1 (10th Cir. 1990); *see also Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999) ( "[T]he inmate must allege more than his personal belief that he is the victim of retaliation.").  Courts have recognized that, in retaliation claims, the presentation of circumstantial evidence such as temporal proximity, a chronology of events, or suspicious timing may be sufficient to support allegations of retaliation.  *See Smith v. Maschner*, 899 F.2d 940, 949

(10th Cir. 1990) (holding that the inmate sufficiently supported retaliation claim with "only means available to him—circumstantial evidence of the suspicious timing of his discipline, coincidental transfers of his witnesses and assistants"). None of that circumstantial evidence is present here.

Instead, there is substantial evidence that Mr. Wade's classification was not as a result of his grievances, but rather as a result of his conduct while incarcerated at MCDF. As a threshold matter, the fact that Mr. Wade filed more grievances than any other inmate while at MCDF but was never put on kite restriction demonstrates conclusively that the MCDF had no interest in preventing Mr. Wade from filing kites. Further, Sergeant Shawna Roundtree testified at length in her deposition that Mr. Wade was associated with known shot-callers, that he actively intimidated other inmates, and that many inmates had asked to "self-regress" in order to get away from Mr. Wade and his influence. Facts at 25. Self-regressing is a request by an inmate to be placed in a higher or different security level so that they are moved from their current housing to a new housing. Facts at 26. It is telling that inmates with substantial criminal records felt the need to get away from Mr. Wade and for that reason sought to self-regress. It is also telling that following Mr. Wade's re-classification, the requests for self-regression stopped. Facts at 10.

With respect to Mr. Wade, Sergeant Roundtree recommended that he be re-classified into Cedar pod because of the problems and concerns he was raising with other inmates in Pinyon pod. Facts at 27. Based on Sergeant Roundtree's evaluation of Mr. Wade's inmate activity logs, her conversations with other deputies, her conversations and investigation into self-regressing

requests from other inmates and her and other MCDF staff's observations of Mr. Wade she recommended that he be classified to Cedar.  Facts at 28.

Sergeant Roundtree's investigation, analysis and conclusions, unrelated to any kites that Mr. Wade filed, were the reasons why he was reclassified into Cedar pod.  Other than his conclusory allegations and assumptions, Mr. Wade can point to no evidence that demonstrates that his reclassification was solely or predominantly based on the filing of kites as opposed to his conduct in the MCDF.

Thus here, unlike *Maschner* or other cases where circumstantial evidence points to no reason other than an impermissible one for actions taken, there is a history of disciplinary concerns and questionable actions by Mr. Wade that, when taken in the aggregate, provide a legitimate penological interest and bases for re-classifying him to maximum security that are wholly separate and distinct from any kites he filed.  The fact that Mr. Wade was undeterred in filing kites by his own admission, coupled with the lack of any credible evidence demonstrating that the reason for his reclassification was in any way related to the kites he filed means that no reasonable juror could conclude that the MCDF reclassified Mr. Wade primarily or solely because he filed kites and as an attempt to punish him or dissuade him from continuing to do so. Accordingly, Mr. Wade's claim of retaliation for filing kites must fail.

**3.     Objective data demonstrates that classification in Cedar pod is not based on race and, therefore, contrary to Mr. Wade's assertion, he was not placed in Cedar pod because he was white and white inmates are not statistically more likely to be placed in Cedar pod than inmates of other races.**

In the Tenth Circuit, in order to successfully state an equal protection claim, "a plaintiff first must demonstrate that he has been treated differently from others with whom he is similarly

situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Neal v. McKune*, 2013 U.S. Dist. LEXIS 50769, at *18 (D. Kan. Apr. 9, 2013) *citing Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Further, even if Mr. Wade were treated differently—and he was not--there is a presumption in favor of the validity of prison officials' disparate treatment when based on a legitimate penological interest like, for example, the safety and security of the facility, inmates and staff. *See generally, Hill v. Pugh*, 75 F.App'x 715, 720 (10th Cir. 2003).

Here, Mr. Wade alleges in his complaint that he was discriminated against because he is white and at the MCDF white inmates are improperly placed in Cedar pod based upon their race. Complaint at 18. However, data from Cedar pod demonstrates just the opposite and therefore, Mr. Wade has failed to establish a factual basis for his equal protection claim.

Captain Art Smith investigated the race of inmates placed in Cedar 2 for the period from October 14, 2014 when Mr. Wade was first placed into Cedar 2[8] through August 3, 2017.[9]  Facts at 29.  Captain Smith's analysis reveals that, during that time, the racial makeup of the inmate population for the whole of the MCDF was as follows:

2015 - African-Americans constituted 3.73% of all bookings into MCDF

2016 – African-Americans constituted 3.24% of all bookings into MCDF

---

[8] Although the data was not specifically researched, empirically, Captain Smith believes that data for Cedar 3 is the same or substantially the same as the data reported for Cedar 2.  Facts at 32.

[9] It is important to note that this analysis reflects *post-hoc* research into the race of inmates placed in Cedar pod compiled to refute the specific allegations in this case.  Racial classification is not tracked, reviewed or otherwise utilized in any way by MCDF nor is it part of any policy at MCDF in determining classification of either pre-trial detainees or inmates.  Facts at 33.

2017 – African-Americans constituted 4.0% of all bookings into MCDF

2015-2017        Hispanics constituted 16% of all bookings into MCDF

2015-2017        Caucasians constituted 80% of all bookings into MCDF

Facts at 30.

During that same period, the racial breakdown of inmates in Cedar 2 was as follows:

African-Americans constituted 9.4% of all inmates housed in Cedar 2

Hispanics constituted 13.5% of all inmates housed in Cedar 2

Caucasians constituted 77% of all inmates housed in Cedar 2

Facts at 31.

Accordingly, on a statistical basis, an inmate is more likely to be housed in Cedar 2 if he is African-American (9.4% of Cedar inmates were African American versus African-Americans being only, on average, 3.65% of the general MCDF population) than if he is white (77% of Cedar 2 inmates are white versus greater than 80% white in the general population of the MCDF). These statistics, coupled with the fact that Mr. Wade cannot present any evidence of racial discrimination--other than pure conjecture—means that Mr. Wade cannot establish a *prima facie* case of discrimination based on his race in placement in Cedar pod because, as the data indicates, whites were not more likely to be placed in Cedar pod than any other race at the MCDF and he has produced no evidence of purposeful discrimination. *McKune*, 2013 U.S. Dist. LEXIS 50769 at *18.

Further, as detailed above, the factors MCDF took into consideration in classifying Mr. Wade into maximum security were related to his conduct while an inmate at MCDF and unrelated to his race.  Facts at 34.   Accordingly, the statistical evidence coupled with the legitimate penological reasons for Mr. Wade's classification into maximum security and the lack of any contravening evidence of purposeful discrimination leads to the conclusion that no reasonable juror could find as a matter of law or fact that Mr. Wade's classification into Cedar pod was impermissibly based upon his race.  Accordingly, Defendants are entitled to summary judgment in their favor on Mr. Wade's equal protection claim.

**4.     Mr. Wade is no longer incarcerated at the MCDF and therefore, he lacks standing to obtain an injunction relating to MCDF and its policies.  Further, any alleged harm Mr. Wade might suffer in the future is too speculative to support injunctive relief and does not demonstrate a requisite constitutional significance to obtain the relief requested.**

Mr. Wade's fourth cause of action requests injunctive relief to modify the policies and procedures at the MCDF.  *See Complaint* at 19.  However, Mr. Wade is no longer incarcerated in the MCDF.  Facts at 35.  Accordingly, Plaintiff cannot show "a likelihood of substantial and immediate irreparable injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660 (1983). In other words, Plaintiff lacks standing to seek injunctive relief to change the policies and procedures at the MCDF because Plaintiff cannot show a good chance of being injured by those policies in the future or demonstrate a threat of immediate harm from those policies. *Green v. Branson*, 108 F.3d 1296, 1299-1300 (10th Cir. 1997).

A plaintiff is entitled to injunctive relief only if he or she has a personal stake in the outcome of the litigation. *Stewart v. McGinnis, et al.*, 5 F.3d 1031, 1038-1039 (7th Cir. 1993). *See also, Hill v. Osborne*, 2012 U.S. Dist. LEXIS 69330, *8 - *9 (N.D. Ill. 2012); *Shaw v.*

*Officer Lelewinski*, 2011 U.S. Dist. LEXIS 89224, *3 (N.D. Ill. 2011); *Ridderbush v. Naze, et al.*, 1995 U.S. App. LEXIS 23059, *6 - *7 (7th Cir. 1995).  Personal stake is defined, as follows:

> Abstract injury is not enough. The plaintiff must show that he "has sustained or is <u>immediately</u> in danger of sustaining some direct injury" as the result of the challenged official conduct and the injury or threat of injury must be both "<u>real and immediate," not "conjectural" or "hypothetical.</u>"

*Stewart, supra.*, 5 F.3d at 1037 (internal citation omitted)(emphasis added).

In this case, Plaintiff was released from the MCDF on or about November 9, 2016.  Facts at 35.  Therefore, Plaintiff cannot demonstrate that he is under an immediate threat of harm from the "absence of effective policies" at the MCDF as he alleges in the Complaint.  *Ridderbush, supra.*, 1995 U.S. App. LEXIS 23059, at *6 - *7.  Accordingly, there is no genuine issue of material fact or law that Plaintiff lacks standing for his claim for injunctive relief to modify policies and procedures at MCDF and therefore the Court should grant summary judgment in Defendants' favor.

Alternatively, although not articulated in the Complaint, Mr. Wade has testified that what he is actually seeking through his request for injunctive relief, is to expunge his record of information he believes is incorrect in stating or implying that he is a member of a gang because he believes that someone somewhere might take adverse action against him or harm him.  Facts at 36.  Importantly, Mr. Wade does not testify that anyone has taken any adverse action against him, only that it might happen in the future.  Facts at 37.  Thus, based on his testimony that there is no immediate danger, Mr. Wade cannot sustain a claim for injunctive relief.  *Stewart, supra.*, 5 F.3d at 1037 (the "threat of injury must be both "<u>real and immediate," not "conjectural" or "hypothetical.</u>")

Further, a "government agency's publication of false or defamatory information is not, by itself, a constitutional violation; rather, the plaintiff must show that an additional action taken on the basis of the information (sometimes called "stigma plus") deprived him of a liberty or property interest secured by the Constitution." *Vann. v. Okla. State Bureau of Investigation*, 28 Fed. Appx. 861, 863 (10th Cir. 2001) *citing Paul v. Davis*, 424 U.S. 693, 712, 47 L. Ed. 2d 405, 96 S. Ct. 1155 (1976). Thus, even if the MCDF records contained inaccurate information—and they do not—a constitutional cause of action accrues if and only if a government agency takes action against him based on the incorrect information. Mr. Wade has not testified as to the existence of any such action and he is no longer incarcerated in the MCDF. Therefore, there is no basis to grant injunctive relief for any alleged actual or potential constitutional violation by the MCDF.

The Tenth Circuit does not appear to have addressed the issue of incorrect information in a prison record where no corresponding actual or imminent harm has been alleged, although the Fourth and Sixth Circuits have held that a prisoner does have a constitutional right to have incorrect information expunged from his prison file under certain circumstances not present here. *See Owens v. Birkett*, 2001 U.S. Dist. LEXIS 23095, at *9 (E.D. Mich. Sep. 21, 2001) *citing Paine v. Baker*, 595 F.2d 197 (4th Cir. 1979); *Pruett v. Levi*, 622 F.2d 256, 258 (6th Cir. 1980). Under the *Birkett/Paine* test, "first, the prisoner must establish that specific information regarding his prior criminal record or disciplinary offenses is false; second, there must be a probability that the information will be relied upon in a "constitutionally significant" manner -- such as for parole decisions; and third, a prisoner must allege that he requested that the information be expunged and prison officials refused." *Id.* at 10. The common thread for

actionable incorrect information in all of the cases discussed is the notion of "constitutional significance."  In other words, for Mr. Wade to have a colorable claim to alter his prison records he must show that there is a constitutional infirmity at issue, and not merely a speculative concern that other inmates may act negatively towards him.  He has alleged only the latter and this is insufficient to sustain his claim for injunctive relief.

Alternatively, even if the Tenth Circuit were to adopt the *Birkett/Paine* test, Mr. Wade cannot satisfy any of the three prongs of the test.  First, Mr. Wade has not identified any specific information in his prison record that is false.  If, for example, the MCDF has recorded that they were informed that Mr. Wade was in a gang, this is a correct statement regardless of whether Mr. Wade actually was a member, unless Mr. Wade can demonstrate the MCDF was not so informed.  Similarly, if an MCDF Sergeant observed Mr. Wade and made conclusions about his affiliations, such conclusions may turn out to be erroneous but the record that such conclusions were reached is not.  In any case, it was Mr. Wade's burden to identify specific false information in his record and he has failed to do so.  Second, Mr. Wade has stated that his concerns are that inmates in the future might react badly and treat him differently or negatively if they were to discover some alleged erroneous information. Facts at 37. This concern does not raise a "constitutionally significant" adverse action akin to a parole decision.  To meet the test, Mr. Wade must identify an action or potential action by a government agency that will adversely impact his constitutional rights akin to a parole decision, visitation, etc.. *Owens*, 2001 U.S. Dist. LEXIS 23095 at *9.  Finally, Mr. Wade did not request that any specific erroneous information be expunged while he was incarcerated in the MCDF and he therefore, did not have such a

request refused.[10]  Facts at 38.  Further, by failing to make such a request Mr. Wade failed to exhaust his administrative remedies and this is a jurisdictional impediment to proceeding with his claim.  *See generally, Jones v. Bock*, 549 U.S. 199, 204 (2007); *also* 42 U.S.C. § 1997e(a).  Thus, Mr. Wade's claim for injunctive relief should be denied and summary judgment granted in Defendants' favor on that claim.

WHEREFORE, Defendants respectfully request that the Court grant summary judgment in their favor and against Plaintiff on all of Plaintiff's claims, and for such other and further relief as the Court deems proper.

---

[10] Mr. Wade submitted a single request to have information redacted from behavioral reports and, at his request, his name was removed from one incident report and another incident report in which he was named was deleted.  This is the only request Mr. Wade made to have information redacted from a record while at MCDF and his request was not refused.  Facts at 38.  If Mr. Wade felt the issue was unresolved, he could have continued the grievance process, i.e., filing a grievance and an appeal if the issue remained unresolved.  He did not do so and, therefore, he failed to exhaust his administrative remedies even as to this single request.

Dated:  February 22, 2018

Respectfully Submitted,

By: *s/ Andrew B. Clauss*
    Andrew B. Clauss, Atty. Reg. No.: 33831
    Chris W. Brophy, Atty. Reg. No.: 39381
    Courtney E. Bartkus, Atty. Reg. No.:50193
    DINSMORE & SHOHL,  LLP
    1775 Sherman Street, Suite 2500
    Denver, Colorado 80203
    Phone: (303) 296-3996
    Fax: (303) 296-0344
    Email: Andrew.Clauss@dinsmore.com
        Chris.Brophy@dinsmore.com
        Courtney.Bartkus@dinsmore.com
    *Attorneys for Defendants Art Smith, Steve Farlow,*
    *Russ Kendall, Brian Wade Pacheco, Brenda*
    *Apolinar, Shawna Roundtree, and Christopher*
    *Kiefer*

**CERTIFICATE OF SERVICE**

I hereby certify that on this this 22nd day of February 2018, I presented the foregoing DEFENDANTS' MOTION FOR SUMMARY JUDGMENT  to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of the filing to the following counsel of record:


Daniel R. Shaffer, #35661
Daniel R. Shaffer, L.L.C.
405 Ridges Blvd., Ste. B
Grand Junction, CO 81507
*Attorney for Jerod Lance Wade*


*s/ Shannon Wallis*

A duly signed original is on file at the Law Offices of Dinsmore & Shohl