IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 16-cv-1883-WJM-GPG

JEROD LANCE WADE,

    Plaintiff,

v.

ART SMITH, in his official and individual capacity as Detentions Captain;
STEVE FARLOW, in his official and individual capacity as Former Detentions Captain and Lieutenant;
BRENDA APOLINAR, in her official and individual capacity as Lieutenant;
SHANWNA ROUNDTREE, in her official and individual capacity as Sergeant,

    Defendants.

**ORDER GRANTING SUMMARY JUDGMENT AND TERMINATING CASE**

By way of 42 U.S.C. § 1983, Plaintiff Jerod Lance Wade ("Wade") sues various employees of the Mesa County Detention Facility (collectively, "Defendants") for First Amendment retaliation, procedural due process violations, and Fourteenth Amendment Equal Protection Clause violations. Currently before the Court is Defendants' Motion for Summary Judgment. (ECF No. 103.) For the reasons explained below, the Court will grant this motion, direct entry of judgment, and terminate this case.

**I. LEGAL STANDARD**

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the

relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. FACTS

The following facts are undisputed unless attributed to a party or otherwise noted.

Wade was a Mesa County Detention Facility ("Facility") pretrial detainee in 2013 and 2014. (ECF No. 83 ¶¶ 23–34.) The Facility has various discrete housing units, more commonly known as "pods." (ECF No. 103 at 5, ¶ 4.)[1] The pods are named for species of trees. (*Id.* ¶¶ 5–6.) "Oak" pod is minimum-security; "Pinyon" pod was medium-security at the time relevant to this lawsuit; "Cedar 2" pod is maximum-security without solitary confinement; and "Cedar 3" pod is maximum-security with solitary confinement (23-hour lockdown). (*Id.* at 5–7, ¶¶ 5–6, 13–15; ECF No. 108 at 3, ¶ 15.)

On September 29, 2014, the Facility moved Wade from Pinyon pod to Cedar 3 pod. Defendants claim that the Facility made this move because it had re-classified

---

[1] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination, particularly in exhibits.

2

Wade "as a person posing a security risk to other inmates in Pinyon pod and otherwise disrupting the management of the jail." (ECF No. 103 at 6, ¶ 8.) Defendants further claim that the decision was made largely on a history of "multiple inmates requesting 'self-regression,' a concept where an inmate can ask to be moved to a different or higher [security] level, in this case to get away from Mr. Wade." (*Id.* ¶ 9.) In particular, Defendant Roundtree claims that she received reports of Wade's behavior as an alleged "pod boss" or "shot caller" for a white supremacist organization. (ECF No. 108-3 at 20–21.) Inmates, Roundtree says, reported that Wade "actively intimidated" them, prompting their requests for self-regression. (ECF No. 103 at 8, ¶ 25.) Roundtree therefore recommended the move to Cedar 3. (*Id.* at 9, ¶¶ 27–28.)[2]

Wade disputes Defendants' explanation. He claims that the move to Cedar 3 was in retaliation for his exercise of First Amendment rights, *i.e.*, use of the Facility's kite, grievance, and appeal procedures. (ECF No. 108 at 2, ¶ 8.) A "kite" is a paper form that Facility detainees submit "to make ordinary, daily requests." (ECF No. 103 at 5, ¶ 3.) Grievances and appeals are part of the formal procedure for challenging Facility actions with which the detainee disagrees. (ECF No. 108-5 at 13.) It is undisputed that, during his time at the Facility, Wade "filed significant numbers of kites and filed more than twice the number of grievances and appeals than any other inmate." (ECF No. 103 at 8, ¶ 20.) On at least two occasions, Wade successfully challenged Facility actions through the grievance procedure. (ECF No. 83 ¶¶ 24–25.) Wade therefore believes that Facility staff, including Defendants, were upset about his frequent and sometimes successful challenges to their authority, so Defendants chose

---

[2] Obviously someone at the Facility accepted this recommendation. The record does not reveal who.

3

to punish him by placing him in solitary confinement. (*See* ECF No. 108-1 at 20.)

Wade spent about two weeks in Cedar 3. (ECF No. 103 at 6, ¶ 11.) He then spent the remainder of his time at the Facility in Cedar 2. (*Id.* ¶ 12.) The Facility never restricted Wade's ability to file kites, and he continued to submit many kites while in Cedar 3 and then Cedar 2. (*Id.* at 8, ¶¶ 22–23; *see also* ECF No. 83 ¶¶ 42–49.) Generally speaking, detainees in Cedar 2 and 3 file kites frequently. (ECF No. 103 at 8, ¶ 22.)

Wade was released from the Facility in November 2016. (*Id.* at 10, ¶ 35.) He alleges that his Facility record continues to describe him "as a member of the 211 Crew prison gang," a white supremacist organization. (ECF No. 108 at 11.) He is currently in the custody of the Arizona Department of Corrections. (ECF No. 83 ¶ 8.)

### III. ANALYSIS

Wade's currently operative complaint is his Second Amended Complaint ("complaint"). (ECF No. 83.) It alleges four claims for relief, all brought by way of 42 U.S.C. § 1983:

1. retaliation for exercising First Amendment rights;
2. denial of procedural due process when being sent to Cedar 3;
3. denial of equal protection; and
4. denial of procedural due process because he is unable to challenge his Facility record that describes him as a member of a white supremacist organization.

(*Id.* at 16–19.) Defendants argue that all four of these claims fail as a matter of law. In

the course of summary judgment briefing, Wade abandoned his equal protection claim.[3]

The Court will address the remaining three claims in turn.

## A.     First Amendment Retaliation & Qualified Immunity

The parties agree that the Court must judge Wade's First Amendment retaliation claim under the standard set forth in *Shero v. City of Grove*, 510 F.3d 1196 (10th Cir. 2007). (*See* ECF No. 103 at 16; ECF No. 108 at 6.) The "*Shero* test" is as follows:

> Government retaliation against a plaintiff for exercising his or her First Amendment rights may be shown by proving the following elements: (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

510 F.3d at 1203. The Court will discuss these three elements in turn.

### 1.     Was Wade Engaged in Constitutionally Protected Activity?

Defendants focus most of their challenge on this first element. They say that "[t]he Tenth Circuit appears split on the question of whether inmates (and pre-trial detainees) have a constitutionally protected right to a grievance process within a jail, prison or detention facility." (ECF No. 103 at 17.) This assertion is mainly intended as

---

[3] Wade, who is white, originally alleged that white inmates are the only inmates who are "placed in Cedar 2 and 3 without due process for an indeterminate period of time." (ECF No. 83 ¶ 52.) Defendants' summary judgment motion presents statistical evidence and argument that white inmates are not more likely than any other race or ethnicity to be placed in Cedar 2 or 3. (ECF No. 103 at 9–10, ¶¶ 29–32; *id.* at 25–28.) This does not specifically address Wade's argument that only white inmates were denied due process (although Defendants believe due process is not required for reclassification to a new security level and the consequent housing change, *see id.* at 13–16). Regardless, Wade admits Defendants' statistical evidence (*see* ECF No. 108 at 4, ¶¶ 29–32) and otherwise ignores Defendants' challenge to his equal protection claim. He has therefore abandoned it. *See, e.g.*, *Morman v. Campbell Cnty. Mem'l Hosp.*, 632 F. App'x 927, 933 (10th Cir. 2015); *Hinsdale v. City of Liberal*, 19 F. App'x 749, 768–69 (10th Cir. 2001); *Conagra Trade Group, Inc. v. Fuel Exploration, LLC*, 636 F. Supp. 2d 1166, 1171 (D. Colo. 2009).

5

support for Defendants' qualified immunity argument.  (*See id.* at 17, 19.)

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted).  "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  "A right is clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted).

Defendants argue that the supposed split in the Tenth Circuit shows a lack of clearly established law on an inmate's First Amendment right to file a grievance.  (ECF No. 103 at 17–19.)  The Court disagrees that any split exists, and Defendants also incorrectly characterize the right in question.

Defendants' support for the existence of a split is the following string citation:

> Compare *Von Hallcy v. Clements*, 519 F. App'x 521, 523 (10th Cir. 2013) ("[T]here is no independent constitutional right to state administrative grievance procedures." (citing *Boyd v. Werholtz*, 443 F. App'x 331, 332 (10th Cir. 2011), and *Butler v. Brown*, 58 F. App'x 712 (9th Cir. 2003) ("[A] prisoner has no constitutional right to prison grievance procedures.")); *Young v. Gundy*, 30 F. App'x 568, 569–70 (6th Cir. 2002) ("[T]here is no inherent constitutional right to an effective prison grievance procedure."); *and Boyd*, 443 F. App'x at 332 ("Nor does the state's voluntary provision of

6

> an administrative grievance process create a liberty interest in that process.") with Morris v. Fallin, 2017 WL 1683906, at *14 (W.D. Okla. Mar. 29, 2017) ("Prison officials may not retaliate against prisoners for exercising their constitutional rights, including filing internal prison grievances.") (report and recommendation), and Colon v. Coughlin, 58 F.3d 865, 872 (2nd Cir. 1995) (holding that prison officials may not retaliate against prisoners for filing lawsuits or petitioning the government for redress of grievances).

*Id.* at 17 (citations corrected and formatting standardized; alterations in original). All of these decisions, save for the Second Circuit's, are unpublished. "In determining whether the law was clearly established," courts in the Tenth Circuit "may not rely upon unpublished decisions." *Green v. Post*, 574 F.3d 1294, 1310 n.10 (10th Cir. 2009). As for the Second Circuit decision, it is only relevant to a showing that "the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Thomas*, 765 F.3d at 1194. But it is only one decision, and so almost by definition it cannot satisfy this standard. In short, Defendants' attempt to show a lack of clearly established law relies on entirely irrelevant citations.

Defendants also focus on the wrong right, perhaps because the First Amendment uses the phrase "redress of grievances" and "grievance" is also the common technical term for a prisoner's complaint through a formalized internal prison adjudication system. But, as Wade has alleged in his First Amendment claim, the question is not whether the Facility has a constitutional obligation—under the First Amendment, the Fourteenth Amendment Due Process Clause, or otherwise—to provide detainees with a formal system by which to pursue complaints internally (in this case, kites, grievances, and appeals).[4] Thus, the absence of an internal grievance system has no effect on inmates'

---

[4] The unpublished cases Defendants rely upon show that inmates frequently argue for a constitutional right to a grievance system as a corollary to the constitutional right of access to

7

access to the courts. The question, rather, is whether detainees still possess the First Amendment right to "petition the Government"—that is, their jailers—"for a redress of grievances," regardless of the *form* those petitions take.

In the context of prison inmates (those serving a sentence imposed after conviction of a crime), the Tenth Circuit holds that "a prisoner's first amendment right to petition the government for redress of grievances encompasses the filing of inmate administrative appeals." *Fogle v. Pierson*, 435 F.3d 1252, 1264 (10th Cir. 2006).[5] In that same case, the Tenth Circuit held that a prison official could be held liable for First Amendment retaliation in circumstances quite similar to those alleged by Wade:

> Fogle alleges that he was "complaining" about his placement in administrative segregation and threatening to file suit; in response, a [corrections] official told him that if he did not stop complaining he would be transferred to long-term administrative segregation at another facility. Fogle did not stop protesting, and he was subsequently transferred.

*Id.* at 1263.[6]

*Fogle*, moreover, extends a Tenth Circuit decision from more than fifteen years

---

the courts—presumably because the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, requires administrative exhaustion. But the PLRA only requires exhaustion of "such administrative remedies as are available." *Id.* § 1997e(a). If no administrative grievance system exists, inmates may go directly to court—meaning their right of access to the courts has not been infringed by any alleged due process failure to provide inmates with a formal grievance system. Similarly, if a grievance system exists but is functionally worthless, a court may deem the prison to have no "available" administrative remedies. *See Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016).

[5] To be clear, *Fogle* does not hold that a right exists to "inmate administrative appeals," but only that, where such a process exists, the First Amendment protects the speech conveyed through it.

[6] *Fogle*'s precedential holding is almost the opposite of that in a nonprecedential decision on which Defendants rely. *See Von Hallcy*, 519 F. App'x at 524 ("because Von Hallcy has no constitutional right to file a grievance, he cannot show he 'engaged in constitutionally protected activity' required to prove retaliation" (quoting *Shero*'s first element)). This Court must follow *Fogle*, not *Von Hallcy*. *See* 10th Cir. R. 32.1(a); *Green*, 574 F.3d at 1310 n.10.

8

earlier where an inmate alleged that he had been transferred from one prison to another "in retaliation for his activities as chairman of the 'Afrikan Cultural Society.'" *Frazier v. Dubois*, 922 F.2d 560, 561 (10th Cir. 1990). In that circumstance, the Tenth Circuit declared that "a prisoner enjoys no constitutional right to remain in a particular institution and generally is not entitled to due process protections prior to such a transfer," but prison officials nonetheless "do not have the discretion to punish an inmate for exercising his first amendment rights by transferring him to a different institution." *Id.* at 561–62.

Also relevant is *Williams v. Meese*, where the Tenth Circuit relied on *Frazier* to hold that "although [an inmate] has no right to a job or to any particular assignment, prison officials cannot punish [an inmate] for exercising his first amendment rights by denying him certain job assignments or transferring him from one job to another." 926 F.2d 994, 998 (10th Cir. 1991).

The question, then, is whether *Fogle*, *Frazier*, and *Williams* clearly establish the law applicable to Defendants' actions. *See Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) ("The Supreme Court has cautioned [lower] courts not to define clearly established law at a high level of generality . . . ." (internal quotation marks omitted)). The Court perceives only two potentially relevant distinctions: postconviction inmates versus pretrial detainees, and transfer between institutions versus transfer within an institution versus job transfer. As to the pretrial/postconviction distinction, "pretrial detainees . . . retain at least those constitutional rights that . . . are enjoyed by convicted prisoners." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). This distinction is therefore immaterial. As to distinction regarding type of transfer, the Court also finds it

9

immaterial. "[T]he qualified immunity analysis involves more than a scavenger hunt for prior cases with precisely the same facts." *Perea*, 817 F.3d at 1204 (internal quotation marks omitted). *Fogle*, *Frazier*, and *Williams* put prison officials sufficiently on notice that they may violate the Constitution if they reduce a prisoner's privileges in retaliation for speech protected by the First Amendment.

For all these reasons, the Court finds that Wade has sufficient evidence to establish the first element of the *Shero* test, and that the law on this point was clearly established, thus making qualified immunity unavailable to Defendants.

2. <u>Did Defendants' Actions Cause Wade to Suffer an Injury that Would Chill a Person of Ordinary Firmness from Continuing to Engage in that Activity?</u>

The question of chilling effect on a person of ordinary firmness (*Shero* element two) is an objective inquiry that a court may decide as a matter of law. *Shero*, 510 F.3d at 1203. Defendants offer three arguments for judgment as a matter of law in their favor on this element.

Defendants first argue that "[i]f [they] were attempting to take steps to dissuade or chill an inmate, like Mr. Wade, from filing kites, the easier and more effective method [would be] to place him or her on kite restrictions," but Defendants never did so. (ECF No. 103 at 21.) Defendants continue, "Changing [security and housing] classification without a kite restriction has no impact on an inmate's ability to file kites whenever they want and thus, no chilling effect on kite filing." (*Id.*) Defendants' conclusion does not follow from their premise. An official does not need to restrict speech directly to have a chilling effect on speech. Indeed, a retaliation-minded prison official who understands that inmate and detainee grievances enjoy at least some First Amendment protection will have a motive to punish the inmate or detainee through means other than direct

10

speech restrictions. This first argument therefore does not inform the Court's *Shero* element two analysis.

Defendants next argue that "inmates in Cedar 2 and Cedar 3 file kites as frequently as inmates in any other pod and therefore, the mere fact of being classified into Cedar pod has no demonstrable impact on the filing of kites." (*Id.* (*citing id.* at 8, ¶ 22).) This undisputed assertion comes closer to informing the Court's analysis of what, objectively, would chill a person of ordinary firmness. But it still falls short. The problem is that Defendants' data do not distinguish between inmates assigned to Cedar 2 or 3 from the start and those transferred there from less restrictive pods, nor between the many reasons that an inmate may be assigned or transferred to Cedar 2 or 3. Here, Wade alleges that he was transferred from medium-security directly to solitary confinement for no reason he could discern other than the Facility staff's frustration with his repeated complaints. That is the circumstance the Court must keep in mind.

Finally, Defendants argue that Wade's behavior in Cedar 3 shows no chilling effect. (ECF No. 103 at 22.) Defendants cite testimony from Wade's deposition in which he explained that he filed more kites and grievances in Cedar 3 than before because he believed that Cedar 3 was already the worst form of retaliation Defendants could inflict, so he risked nothing by continuing to complain. (*Id.*) Judging from his deposition, however, Wade is not "a person of ordinary firmness." *Shero*, 510 F.3d at 1203. Among other things, he describes "the strong-willed nature of [his] character" and his propensity to "challenge [detention officials'] authority." (ECF No. 108-1 at 20.) He is, in other words, the sort of provocateur around whom First Amendment lawsuits seem to cluster precisely because he or she is willing to take risks that most others would not.

In sum, viewing the matter objectively, the Court holds that transfer to solitary confinement as punishment for submitting grievances to prison officials is the sort of punishment that would chill a person of ordinary firmness from continuing to submit grievances.

### 3. Was Defendants' Adverse Action Substantially Motivated as a Response to Wade's Exercise of Constitutionally Protected Conduct?[7]

In this summary judgment posture, the question under *Shero* element three is as follows: Does Wade have enough evidence from which a reasonable jury could conclude that Defendants transferred him to Cedar 3 in response to his exercise of First Amendment rights?

Wade had an opportunity in his summary judgment response brief to set forth the facts he would attempt to prove. *See* WJM Revised Practice Standard III.E.5. He did not do so. Rather, he chose only to deny Defendants' assertions that they had investigated his allegedly intimidating conduct toward other detainees and had chosen to move him to Cedar 3 for legitimate security reasons. (*Compare* ECF No. 103 at 6–8, ¶¶ 8–9, 24–25 *with* ECF No. 108 at 2–4, ¶¶ 8–9, 24–25.) His "specific reference to admissible evidence in the record supporting the denial," WJM Revised Practice Standard III.E.4(b), comprises: (1) his own deposition testimony where he expresses his belief that the Cedar 3 transfer was retaliatory; and (2) deposition testimony from Defendants Apolinar and Roundtree where they are asked about the detainee self-regression requests that supposedly supported the transfer decision, and they admit

---

[7] As noted, Defendant Roundtree recommended Wade's placement in Cedar 3 and some unknown person approved that recommendation. (*See* n.2, above, and accompanying text.) Ideally, then, analysis of this *Shero* element would focus on Roundtree and whoever ratified her recommendation. But Defendants do not argue for such individual analysis, so the Court will presume that it may treat Defendants collectively.

that Wade's name did not come up during most of those requests. (*See id.* at 2–3,
¶¶ 8–9.)

Arrayed against this is, in particular, Roundtree's deposition testimony that detainees specifically accused Wade at least three times when requesting self-regression: once each on August 10, September 17, and September 28, 2014. (ECF No. 108-3 at 19–21.) According to Roundtree, the latter two accusers specifically linked Wade to white supremacist activity, including ordering an assault on another inmate. (*See id.* at 20–21.)[8] Wade entirely ignores this evidence.

A party wishing to survive summary judgment must have more than a "mere scintilla" of evidence in its favor. *See Adler*, 144 F.3d at 678 n.5. Wade has not risen above that threshold, for several reasons.

First, his own opinion, expressed at his deposition, is insufficient. It is materially no different from resting on his pleadings. *Thomas*, 765 F.3d at 1194 ("On summary judgment, however, the plaintiff can no longer rest on the pleadings . . . ."); *cf. Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999) (in the Rule 12(b)(6) context, stating that "[t]he inmate must allege more than his personal belief that he is the victim of retaliation").

Second, Wade asks the jury to infer that Roundtree and Apolinar were acting pretextually because they admit that most of the alleged reports of self-regression did not mention Wade. But Wade presents no evidence from which a jury could infer that either Roundtree or Apolinar fabricated any of these reports, nor does Wade address

---

[8] Wade does not object that Roundtree's account of the accusers' motivations as hearsay. *See* Fed. R. Civ. P. 56(c)(2). Regardless, Roundtree's testimony is admissible for its "effect on the listener." *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434 (10th Cir. 1993) ("Statements offered for the effect on the listener, however, are generally not hearsay.").

(much less challenge) Roundtree's testimony that three inmates *did* mention Wade specifically, including twice in the two weeks before the Facility transferred Wade to Cedar 3. In context, the inference Wade asks the jury to draw is too thin to reasonably support liability.

Third, even if the jury could reasonably reach an inference of pretext, Wade offers nothing beyond his own opinion that it was a pretext specifically to dissuade him from exercising his First Amendment rights.

For all of these reasons, Wade's First Amendment retaliation claim must fail on this third element of the *Shero* test. The Court will enter judgment as a matter of law in Defendants' favor on this claim.

**B.     Procedural Due Process**

Wade's procedural due process theory is somewhat muddled. He asserts, correctly, that "[d]ue process prohibits a pretrial detainee from being punished prior to a lawful conviction." (ECF No. 108 at 9.) *See also Bell*, 441 U.S. at 535 ("under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law"). He then asserts, also correctly, that "[i]t is undisputed that the purpose of the placement in Cedar [3] was done because of the Defendants['] perception of Mr. Wade's behavior." (ECF No. 108 at 10.) But from there he jumps to the following conclusion: "Thus, Mr. Wade has satisfied the requirement in *Bell* by showing an expressed intent to punish on the part of detention facility officials." (*Id.* at 11.)

As the Court has already stated above in the context of one of Defendants' arguments, the conclusion does not follow from the premise. Wade first needs to specify the "perception of [his] behavior" that motivated Defendants' conduct. Did

14

Defendants perceive Wade as a white supremacist gang leader who was inciting violence and needed to be isolated from the prison population? Or did Defendants perceive Wade as a gadfly that needed swatting? The latter would be "an expressed intent to punish," but the former would not. So the latter perception must be an implicit premise of Wade's argument. But making the premise explicit shows that his procedural due process claim is a more generic way of stating a First Amendment retaliation claim.

A plaintiff may not proceed under the due process clause when a more specific constitutional provision addresses the claim at issue. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 393–94 (1989); *Gehl Grp. v. Koby*, 63 F.3d 1528, 1539 (10th Cir. 1995). Wade's procedural due process will therefore be dismissed as duplicative of his First Amendment retaliation claim.[9]

## C. Injunctive Relief

Wade's final claim is that he is entitled to some process by which he can challenge the notations on his Facility record designating him as a member of a white supremacist group. For this claim, he seeks only injunctive relief, so qualified immunity is not in question. *See Cannon v. City & Cnty. of Denver*, 998 F.2d 867, 876 (10th Cir. 1993) ("Unlike [a] claim for money damages, there is no qualified immunity to shield

---

[9] Interwoven with the argument discussed above is a potentially independent argument that pretrial detainees—as distinct from postconviction prisoners—deserve a hearing before or immediately after any transfer. (*See* ECF No. 108 at 10.) *Cf. Frazier*, 922 F.2d at 561–62 ("a [postconviction] prisoner enjoys no constitutional right to remain in a particular institution and generally is not entitled to due process protections prior to such a transfer"); *Bailey v. Shillinger*, 828 F.2d 651, 652 (10th Cir. 1987) ("Classification of [a postconviction prisoner] into administrative segregation does not involve deprivation of a liberty interest independently protected by the Due Process Clause."). In support of this position, Wade merely declares that such a distinction "is consistent with 10th Circuit law." (ECF No. 108 at 10.) He does not offer any citations. He therefore forfeits the argument. *See, e.g.*, *United States v. Hunter*, 739 F.3d 492, 495 (10th Cir. 2013) (inadequately developed argument deemed forfeited).

[individual] defendants from claims for [injunctive or declaratory] relief.").

Whatever the merits of the claim, a party seeking injunctive relief lacks Article III standing for such relief without a risk of future harm from the challenged practice. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101–06 (1983). Assuming for argument's sake that Defendants are unlawfully maintaining a "white supremacist" designation on Wade's facility record, Wade has nonetheless failed to show that this will lead to future consequences. He is currently serving a sentence in Arizona, and he does not allege that the Facility will share his record with the Arizona prison system or indeed any other facility. His only claim to potential future injury is his counsel's argument that Wade "expects to return to the [Facility] in the future as he has pending appeals [in Colorado state court]." (ECF No. 108 at 11.)[10] Attorney argument is not evidence. *Watson v. Dillon Cos., Inc.*, 2013 WL 4547477, at *7 n.2 (D. Colo. Aug. 28, 2013). But even disregarding that precept, Wade nowhere explains why he expects to return specifically to the Facility because of his appeals,[11] or why he needs to return to Colorado at all. Wade also does not explain what negative effects his Facility record would have on him if he returns there. The Court therefore must dismiss this claim for lack of standing.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendants' Motion for Summary Judgment (ECF No. 103) is GRANTED; and

---

[10] Wade's response brief presents this as Wade's own future expectation, not attorney argument, but the supporting citations to Wade's deposition only address the existence of appeals in Colorado state court, not any expectation that he will return to the Facility on account of those appeals.

[11] If he has appeals, then presumably he was convicted of a Colorado crime; and if convicted of a Colorado crime, it is far more likely that he would be sent to a state prison facility than a county jail.

2. The Clerk shall enter judgment in favor of Defendants and against Plaintiff, and shall terminate this case. The parties shall bear their own attorneys' fees and costs.

Dated this 21st day of September, 2018.

BY THE COURT:

William J. Martinez
United States District Judge